**Renu GUPTA, Plaintiff,**

v.

**CITY OF NORWALK, Defendant.**

**No. CIV.3:98 CV 02153(AWT).**

United States District Court,
D. Connecticut.

Aug. 15, 2002.

Thomas W. Bucci, Willinger, Willinger & Bucci, Bridgeport, CT, for Plaintiff.

Louis S. Ciccarello, Lovejoy & Rimer, M. Jeffry Spahr, Katherine B. Lasberg, Corporation Counsel's Office, Colleen Vallerie–Zingaro, Office of Corporation Counsel, Norwalk, CT, for Defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

The plaintiff, Renu Gupta ("Gupta"), brings this action against her employer, the City of Norwalk (the "City") in six counts, alleging that the City: (1) violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (the "FMLA"); (2) unlawfully retaliated against the plaintiff for exercising her rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(2); (3) deprived the plaintiff of her constitutional right to procedural due process, in violation of 42 U.S.C. § 1983; (4) intentionally inflicted emotional distress upon the plain-tiff; (5) negligently inflicted emotional distress upon the plaintiff; and (6) discriminated against the plaintiff on the basis of her national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The defendant has moved for summary judgment as to each count of the First Substituted Complaint. For the reasons set forth below, the defendant's motion for summary judgment is being granted, in part, and denied, in part.

## I. *FACTUAL BACKGROUND*

The plaintiff is an American citizen of Indian descent.

On or about April 25, 1983, the plaintiff was hired by the City as a nutritionist for the City's WIC program. On or about April 16, 1984, the plaintiff was promoted to the position of Director of the WIC program; this position was later renamed "Coordinator" of the WIC program. Gupta served as Director or Coordinator of the WIC program from 1984 through November 13, 1998.

The plaintiff testified at her deposition that She had problems with Timothy Callahan ("Callahan"), the City's Director of Health, for many years. She stated: "Tim [Callahan], he called me names. He called me an Indian bitch. He called me—he said this is freaking shit. He threw the papers at me." Gupta Dep. at 22. Gupta further testified that she felt throughout her employment with the City that she was treated differently because of her race and/or national origin in various ways, including not being permitted to attend certain conferences and not receiving a bonus that was set aside for the person holding her position. In addition, Gupta testified that although funding was available from the state to provide WIC services to Hispanic aliens, and the WIC program was

required to serve aliens, Callahan would not permit her to do so.

In 1998, the plaintiff requested that she be permitted to take vacation time from April 13, 1998 through April 20, 1998 because of a family emergency, specifically, the fact that her grandmother in India was dying. The vacation was approved, and the plaintiff was scheduled to return to work on April. 21, 1998. On or about April 16, 1998, the plaintiff's sister, Archana Seth ("Seth") contacted Helene Heissenbuttel ("Heissenbuttel"), the plaintiff's immediate supervisor, and informed her that the plaintiff had become seriously ill while in India. Seth also told Heissenbuttel that Gupta's doctor had advised her not to travel due to her illness.

On April 28, 1998, Heissenbuttel sent a letter to Gupta's home, a copy of which she also sent to Seth. The letter stated that the call from Seth was insufficient to excuse Gupta's absence beyond April 21, 1998, and that Gupta would be required to submit a statement from a physician including information regarding how long Gupta would be out of work. The letter stated: "You must immediately report a valid reason for your absence to either myself or Timothy Callahan. If I do not receive a valid reason for your absence by noon on Friday, May 1, 1998[,] I will initiate further action regarding your employment with the City of Norwalk." Mot. Summ.Jmt.Ex. C.

On May 1, 1998, Seth sent a note to Heissenbuttel by facsimile, attaching a statement from Dr. K.K. Soni of Panipat, India dated April 23, 1998. The doctor's statement reads: "It is certified that Ms. Renu Gupta is suffering from P.U.O. (Pyrexia of Unknown Origin). She is under my [care] since 16th April 1998 and necessary tests are being carried out. She is advised not to travel." Mot. Summ.Jmt.Ex. D. This facsimile was re-

ceived by Heissenbuttel at 9:00 a.m. on May 1, 1998.

On or about May 11, 1998, Callahan wrote a letter to the plaintiff. The letter stated that because Gupta had not contacted the City since May 1, 1998, Gupta's absence from work was considered "unauthorized". The letter further stated: "Upon your arrival and prior to your return to work, you must schedule to meet with Ms. Heissenbuttel and myself. Absent a satisfactory explanation for your absence and your failure to communicate with us, the City reserves the right to take appropriate disciplinary action up to and including termination." Mot. Summ.Jmt.Ex. E. Callahan sent a copy of this letter to Gupta's home address, as well as one to her care of Seth, requesting that Seth forward the letter to Gupta.

On or about May 12, 1998, Dr. Soni wrote another note, which was apparently sent by facsimile to the City. The note reads: "It is certified that Ms. Renu Gupta is suffering from Typhoid Fever. She is under my [care] and advised complete rest." Mot.Summ.Jmt.Ex. F.

On or about June 2, 1998, Callahan wrote a letter to Gupta which he again mailed to her home address as well as to her sister. This letter reads, in its entirety:

> The only information we have received to explain your unauthorized leave has been notes from Dr. Soni of the Soni Hospital. This information was relayed to us by Archana Seth, your sister. Since we have not heard directly from you, your unauthorized leave is also unpaid. In the event you do not contact me directly by June 8, 1998, I will consider termination of your employment with the City of Norwalk.

Mot.Summ.Jmt.Ex. H.

On or about June 2, 1998, Callahan also wrote a letter to Dr. K.K. Soni and Dr.

Veena Soni. The letter reads, in part, as follows:

A note signed by you dated May 12, 1998 diagnosing Renu Gupta as having Typhoid fever was sent to me. I represent Ms. Gupta's employer, the City of Norwalk. Ms. Gupta has not contacted us directly, as is required by our work rules. In order for us to comply with government regulations we are attempting to gather information on the health status of this employee. Your assistance in this regard is appreciated.

Please forward to me a letter describing the serious medical condition that is preventing Ms. Gupta from returning to work. I also need to know the probable length of the medical leave and a date the employee can be expected to return to work.

Mot.Summ.Jmt.Ex. K.

On June 22, 1998, the City received a note by facsimile from Dr. Abhijit Nan from India, which reads as follows: "Certified that Renu Gupta . . . is suffering from typhoid fever from [May 28, 1998] and is under treatment. I advised her rest for one month." Mot.Summ.Jmt.Ex. I.

On July 6, 1998, the City received a note signed by Doctor S.B. Mukherjee of Calcutta, India, and dated June 25, 1998, which reads: "Certified that Renu Gupta is under my treatment for relapse Typhoid Fever from [June 15, 1998]. I advised her to take complete bed rest for another 6 wks." Mot.Summ.Jmt.Ex. J.

Also, Dr. K.K. Soni wrote a letter to Callahan dated August 8, 1998, which reads, in part, as follows:

Mrs. Gupta had high fever on [April 14, 1998] which was diagnosed as ty-

phoid fever later. She developed severe complications and [intestinal hemorrhage] leading to severe anaemia. She was advised complete bed rest during this period. Unfortunately, she had a relapse of typhoid fever.

During this period she was not allowed to leave the house (i.e. for [April 16, 1998] to [August 6, 1998])

Now on examination she is allright but has some weakness. She is allowed to travel and join her job with advise to begin 3 times per week for one month. There after she can resume her normal schedule.

Mot.Summ.Jmt.Ex. K.

On August 10, 1998, Gupta informed the City that she was capable of resuming her duties at work. However, the City told Gupta that she was not to report to work at that time. On August 12, 1998, Gupta attempted to resume her duties but was prevented from entering the building in which she worked. The same day, Gupta received a memorandum from the City's Director of Personnel stating that a meeting had been scheduled for August 14, 1998 to discuss Gupta's absence from work from April 21, 1998 to that date. Gupta attended the meeting.[1] The plaintiff was not informed that the meeting involved possible disciplinary action against her; she was not informed at the meeting of any charges against her, nor was she given an opportunity at that time to refute any such charges.

On or about August 26, 1998, Callahan spoke to Dr. Soni by telephone, and then wrote a letter to the doctor. The letter reads, in part, as follows:

---

1. The court has been unable to locate in either party's papers any description of what occurred at this meeting. However, Gupta apparently produced at the meeting her airline tickets and itinerary for her travel to India; these documents were included as ex-

hibits to the defendant's motion for summary judgment. The evidence suggests that the defendant believes that these documents were somehow altered. However, the defendant fails to provide any specifics.

Please provide the date of onset of typhoid fever, the basis for diagnosis (clinical, serologic, culture) and the date treatment started.

I understand typhoid is a reportable disease. Was this case investigated, were other cases found and was the source found?

In your August 8, 1998 letter, you cleared Ms. Gupta to return to work 3 days per week for 1 month with a normal schedule to follow. Ms. Gupta appeared extremely weak last week. Given your proposed schedule, I am concerned of a relapse. How probable is this? Finally, is Ms. Gupta a carrier of typhoid and, if so, should precautions be taken?

Mem.Opp.Summ.Jmt.Ex. 24.[2]

On or about August 29, 1998, Dr. Soni sent a note to Callahan by facsimile in response to Callahan's letter. The note stated that in Dr. Soni's experience, there was no chance of a relapse and that Gupta therefore could no longer be considered a typhoid carrier. The note further stated that Gupta had presented with "pyrexia of unknown origin" on April 23, 1998, and that Gupta had been diagnosed with typhoid fever on April 30, 1998 clinically and by medical tests. Gupta began treatment on the day she was diagnosed. Finally, Dr. Soni stated that typhoid fever is not reportable to any government agency. *See* Mot.Summ.Jmt.Ex. M.

Gupta was not contacted by the City after the August 14, 1998 meeting. However, she was apparently suspended from work for three weeks (15 days) after the meeting. Gupta was not informed of the suspension. She wrote a letter on August 31, 1998 which reads, in part, as follows:

I am writing you today because I can no longer borrow money to survive. Therefore, if this untenable situation is not resolved by this Friday at noon (September 5, 1998), I will be forced to pursue appropriate remedial recourse.

Compl.Ex. 6. The plaintiff was contacted and permitted to return to work effective September 10, 1998. On September 9, 1998, Gupta learned that she had been suspended for the preceding three weeks, and that was why she had not been permitted to return to work.

The City refused to pay Gupta for 29 days she did not work. Gupta requested that she be paid for these days, as she had sick time available and claimed to have been ill during the time she was out of work.

On September 15, 1998, Gupta filed a grievance against the City requesting that the City pay her for 15 days and remove a letter from her file. The grievance was

---

**2.** The World Health Organization's website describes typhoid fever as follows:

Typhoid fever is caused by Salmonella typhi, the typhoid bacillus. At present, there are 107 different strains of the bacteria. Typhoid fever is characterized by the sudden onset of sustained fever, severe headache, nausea, severe loss of appetite, constipation or sometimes diarrhoea. Severe forms have been described with mental dullness and meningitis. Case-fatality rates of 10% can be reduced to less than 1% with appropriate antibiotic therapy.

World Health Organization, Fact Sheet N149 (March 1997), available at *http://www.who.int/inf-fs/en/fact149.html.*

The National Library of Medicine's online medical encyclopedia states that typhoid fever "usually resolves in 2 to 4 weeks with treatment. The outcome is likely to be good with early treatment, but becomes poor if complications develop. Cases in children are milder, and are more debilitating in the elderly. Relapse may occur if the treatment has not fully eradicated the infection." United States National Library of Medicine, MedLine Plus Medical Encyclopedia, available online at *http:// www.nlm.nih.gov/medlineplus/ency/ article/001332.htm.*

denied by Heissenbuttel on September 18, 1998.

Gupta claims that, after she returned to work, she was not allowed to function in her former role as the Director of the WIC program. Although Gupta had formerly attended conferences and meetings, these were now attended by her subordinates.

Gupta was absent from work on October 20, 21, 22 and 23, 1998; Gupta informed the City that she was sick on those days. However, Heissenbuttel contacted Gupta on October 22, 1998 and told her that she would need to present a note from her doctor when she returned to work, verifying that she was sick. Gupta returned to work on October 26, 1998, but did not bring a note from her doctor. Heissenbuttel suspended Gupta without pay for one day for insubordination as a result. On October 27, 1998, Gupta filed a grievance of this suspension, which was denied by Heissenbuttel.

On or about November 9, 1998, Gupta informed the City that she intended to resign her position effective November 15, 1998.

On or about October 2, 1998, Gupta had been offered a position as a "Senior Consultant II" with a company in New Jersey. On or about October 8, 1998, Gupta had accepted this position, with a start date of November 16, 1998.

Gupta testified at her deposition that as a result of the actions of Callahan and other agents of the defendant, she suffered severe emotional distress, as well as physical ailments including insomnia, ulcers, and cardiac palpitations.

## II. *LEGAL STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A ma-

terial fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock,* 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock,* 224 F.3d at 41. If the nonmovant fails to meet its burden, summary judgment should be granted.

## III. *DISCUSSION*

The defendant has moved for summary judgment on all six counts of the complaint. The defendant argues, as a threshold matter, that the plaintiff's claims are barred in their entirety for two reasons. First, the defendant contends that each of the plaintiff's claims is barred by section 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185(a). However, the Labor Management Relations Act applies only to "employers" as defined therein, and the Act defines "employer" as follows:

> The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof. . . .

29 U.S.C.A. § 152(2) (West 1998). The defendant in this case is the City of Norwalk, which is a political subdivision of the State of Connecticut. *See Utd. Bldg. and Constr. Trades Council of Camden Cty. and Vicinity v. City of Camden*, 465 U.S. 208, 215, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) ("[A] municipality is merely a political subdivision of the State from which its authority derives."). Therefore, the Labor Management Relations Act does not apply here.

■■■■■ Second, the defendant contends that each of the plaintiff's claims is barred by the doctrine of governmental immunity. The doctrine of governmental immunity for municipalities has been codified in Connecticut law as Conn.Gen.Stat. § 52–557n. This statute reads, in relevant part, as follows:

(a)(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . .

(2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Conn.Gen.Stat. § 52–557n (West 2002). However, "there is no immunity defense, either qualified or absolute, available to a municipality sought to be held liable under 42 U.S.C. § 1983." *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 74 (2d Cir.1992). Also, as to the Title VII claim, "[w]hen the

Act was first passed municipalities were not defined as 'employers' under Title VII, see 42 U.S.C. § 2000e(b), and therefore were not subject to its provisions. The Equal Employment Opportunity Act of 1972, 86 Stat. 103, effective date, Mar. 24, 1972, amended the statute so as to bring municipal employers within its purview." *Guardians Assoc. of the New York City Police Dept. v. Civil Serv. Comm'n of the City of New York*, 633 F.2d 232, 236 n. 5 (2d Cir.1980). Thus, Conn.Gen.Stat. § 52–557n does not provide the City with immunity from suit under either 42 U.S.C. § 1983 or Title VII.

The analysis is similar with respect to the FMLA. The "employers" covered by the FMLA include public agencies, *see* 29 U.S.C.A. § 2611(4) (West 1999), and the definition of "public agency" includes "the government of a State or political subdivision thereof." *See* 29 U.S.C.A. § 203(x) (West 1998). Also, it should be noted that Conn.Gen.Stat. § 52–557n, which was enacted as part of Connecticut's Tort Reform Act, 1986 Conn.Acts 86–338 (Reg.Sess.) and 1987 Conn.Acts 87–227 (Reg.Sess.), applies only to tort claims and thus does not apply to actions brought under the FMLA. *See Sanzone v. Board of Police Commissioners*, 219 Conn. 179, 592 A.2d 912 (1991); Douglass B. Wright et al., *Connecticut Law of Torts* 480 (3d ed.1991). Therefore, Conn.Gen.Stat. § 52–557n does not bar the plaintiff's claims under the FMLA.

As discussed below, however, the plaintiff's claim for intentional infliction of emotional distress is barred by Conn.Gen.Stat. § 52–557n, and although her claim for negligent infliction of emotional distress is not barred by the statute, it fails for another reason.

The City also contends that its motion should be granted as to each of the plaintiff's claims, because no genuine issue of

material fact exists and the undisputed facts show that it is entitled to judgment as a matter of law.

### A. *First Count: FMLA*

The First Count sets forth a claim that the defendant violated the FMLA in several ways, including: refusing to grant Gupta leave to which she was entitled; conditioning the grant of such leave on unlawful requirements; suspending Gupta without pay for 29 days; and failing to restore Gupta to her position when she returned to work. The record shows that genuine issues of material fact exist as to whether the plaintiff was denied one more rights to which she was entitled under the FMLA. Summary judgment on this count is therefore being denied.

### B. *Second Count: FMLA Retaliation*

The Second Count sets forth a claim that the defendant retaliated against Gupta for exercising her rights under the FMLA by, *inter alia,* preventing Gupta from resuming her duties, preventing other WIC staff from communicating with Gupta, and imposing restrictions on Gupta's future use of sick leave. The record shows that genuine issues of material fact exist as to whether the defendant retaliated against the plaintiff for exercising her rights under the FMLA. Summary judgment on this count is therefore being denied.

### C. *Third Count: 42 U.S.C. § 1983*

The Third Count sets forth a claim under 42 U.S.C. § 1983 based on violation of the plaintiff's right to procedural due process. The complaint alleges that the defendant violated Gupta's right to procedural due process when it suspended her without pay on several occasions in 1998; it also alleges that the City failed to provide Gupta with notice of the reasons for her suspension and a meaningful opportunity to address those reasons. The City contends that it is entitled to summary judgment on this claim because the plaintiff was subject to a collective bargaining agreement which provided an adequate process for review of any disciplinary actions, including the suspension of the plaintiff, and that the plaintiff failed to follow through with this process.[3] Gupta contends that the collective bargaining agreement did not provide an adequate remedy, and that she was entitled to a hearing prior to being suspended. The court does not find persuasive the position advanced by either party on this claim.

As to the defendant's contention that the plaintiff failed to exhaust the remedies available to her under the collective bargaining agreement, the defendant has submitted documents showing that Gupta filed grievances contesting each of the disciplinary actions taken against her. *See, e.g.,* Mot.Summ.Jmt. at 55–56; Ex. P.Ex. S. The defendant has also submitted an excerpt of Gupta's deposition at which she testified that the City paid her for some of the days she was out sick, apparently after Gupta filed a grievance requesting such payment. *See* Mot.Summ.Jmt.Ex. 11 at 191. At one point in its motion, the City argues that "the Plaintiff *did* exercise her rights through the grievance procedure within the Collective Bargaining Agreement." Mot.Summ.Jmt. at 55 (emphasis added). However, at another point, the defendant argues that the plaintiff failed to proceed with her grievance to arbitration,

---

**3.** The collective bargaining agreement states that "[a] grievance is any complaint by an employee or the Union concerning the interpretation or application of a provision of this Agreement." Mot.Summ.Jmt.Ex. Q at 10. The plaintiff's complaint concerns her suspension without pay. The collective bargaining agreement covers suspensions and other discipline. Thus, it appears that the plaintiff's claims were covered by the agreement.

*see id.* at 73, but fails to offer any evidence in support of this argument.[4] Thus, based on the record, the court concludes that genuine issues of material fact exist as to whether Gupta exhausted the remedies available to her under the collective bargaining agreement.

The Supreme Court addressed the issue of procedural due process in the context of suspension without pay in *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). The Court stated:

> To determine what process is constitutionally due, we have generally balanced three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.
>
> Respondent contends that he has a significant private interest in the uninterrupted receipt of his paycheck. But while our opinions have recognized the severity of depriving someone of the means of his livelihood, they have also emphasized that in determining what process is due, account must be taken of the length and finality of the deprivation. Unlike the employee in *Loudermill*, who faced termination, respondent faced only a temporary suspension without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all.

*Gilbert*, 520 U.S. at 931–32, 117 S.Ct. 1807 (internal quotation marks and citations omitted). Here, the plaintiff's private interest that was affected was her economic interest in receiving her full pay. Gupta claims that she was denied sick pay for 29 days while she was in India, that she was suspended without pay for 15 work days following the August 14, 1998 meeting and that she was also suspended for one day without pay.

■ Under *Gilbert*, this denial of sick pay and these suspensions without pay are not sufficient to constitute violations of the right to procedural due process so long as Gupta received a sufficiently prompt post-deprivation hearing. However, as to the suspension following the August 14, 1998 meeting, Gupta claims that she was never notified of the specific charges against her, and was never given an opportunity to refute those charges either before or after the suspension was imposed. Although the Supreme Court has stated that it will "tolerate some exceptions to the general rule requiring predeprivation notice and hearing", it will do so "only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (internal quotation marks and citations omitted). Here, however, it appears that the plaintiff was not even given notice of the suspension until after she had completed serving it, and the defendant points to no governmental interest that was served by the use of such a process.

■ As to the other factors, the risk of erroneous deprivation under such circumstances is a substantial one, because the employer never gets to hear the employ-

---

**4.** The court notes that if it is true, as the City argues, that "[t]he defendant addressed the grievance by a Hearing, removing the suspensions and making the Plaintiff whole", Mot. Summ.Jmt. at 73, then it would be reasonable to conclude that the plaintiff should not have been expected to proceed further with the grievance, because she would have won.

ee's side of the story. Further, there is no indication in the record that the additional cost to the City of providing adequate, either pre-deprivation or post-deprivation, notice and hearing would have been other than minimal. Therefore, the court concludes that genuine issues of material fact exist, at least with respect to the suspension following the August 14, 1998 meeting,[5] as to whether the plaintiff's right to procedural due process was violated, and that summary judgment on this claim is not appropriate.

### D. *Fourth Count: Intentional Infliction of Emotional Distress*

 The plaintiff alleges in the Fourth Count of her complaint that the defendant intentionally inflicted emotional distress upon her. The Connecticut Supreme Court has set forth the necessary elements of a claim for intentional infliction of emotional distress, as follows:

> In order for the plaintiff to prevail in a case for liability under intentional infliction of emotional distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Appleton v. Bd. of Educ.*, 254 Conn. 205, 757 A.2d 1059, 1062 (2000) (internal quotation marks and citations omitted). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn.App. 701, 746 A.2d 184, 192 (2000).

Given that the plaintiff has to establish that the conduct of the defendant's employees was intentional, this claim is barred by Conn.Gen.Stat. § 52–557n, which provides that the City is not liable for the "wilful misconduct" of its employees. This question was analyzed in *Miner v. Town of Cheshire*, where the court reasoned that:

> [S]uch a claim is precluded by Conn. Gen.Stat. § 52–557n, which provides, that "a political subdivision of the state shall not be liable for damages to person or property caused by ... [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or *willful* misconduct ..." Conn.Gen.Stat. § 52–557n(a)(2)(A) (emphasis added). Under Connecticut law, the term "willfulness" is synonymous with "intentional." *Bhinder v. Sun Co.*, 246 Conn. 223, 242 n. 14, 717 A.2d 202 (1998) ("While [courts] have attempted to draw definitional [distinctions] between the terms willful, wanton or reckless, in practice the three terms have been treated as meaning the same thing."), *quoting Dubay v. Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988); *see also Elliott v. City of Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998) (legal concepts of wanton, reckless, willful, intentional and malicious conduct indistinguishable); *Bauer v. Waste Management of Connecticut, Inc.*, 239 Conn. 515, 527, 686 A.2d 481 (1996) ("A willful act is one done intentionally or with reckless disregard of the consequences of one's conduct.").

---

5. The parties did not focus on the other deprivations in detail. Thus, granting summary judgment as to the other deprivations is not appropriate because the defendant has not met its initial burden under the standard for summary judgment.

126 F.Supp.2d 184, 194 (D.Conn.2000). Accordingly, the defendant is entitled to summary judgment on the claim for intentional infliction of emotional distress.

### E. *Fifth Count: Negligent Infliction of Emotional Distress*

The Fifth Count sets forth a claim for negligent infliction of emotional distress. The defendant has moved for summary judgment on this claim on the ground that negligent infliction of emotional distress in the employment context is actionable only where the defendant exhibited unreasonable behavior during the termination process, and in this case, the plaintiff's employment was never terminated.

 The Connecticut Supreme Court recognized a cause of action for negligent infliction of emotional distress, where no physical injury ensues to the victim, in *Montinieri v. S. New England Tel. Co.,* 175 Conn. 337, 398 A.2d 1180 (1978). However, in *Parsons v. Utd. Techs. Corp., Sikorsky Aircraft Div.,* 243 Conn. 66, 700 A.2d 655 (1997), the court stated that "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the *termination process.*" *Parsons,* 700 A.2d at 667 (emphasis added) (internal quotation marks omitted). The Connecticut Supreme Court recently clarified that a claim of negligent infliction of emotional distress may only be brought where the plaintiff alleges that she suffered emotional distress during the termination process,[6] and not as part of an ongoing employment relationship. *See Perodeau v. City of Hartford,* 259 Conn. 729, 792 A.2d 752, 772 (2002). The plaintiff has stated that in light of the *Perodeau* decision, she will not pursue this claim, and summary judgment

will therefore be granted in favor of the defendant on the Fifth Count.

### F. *Sixth Count: Title VII*

The defendant claims that the plaintiff has failed to make out a prima facie case of discrimination on the basis of her race, national origin, and/or alienage under Title VII. The defendant further argues that even if the plaintiff can make out a prima facie case, the defendant has offered evidence of a legitimate, non-discriminatory reason for any adverse employment action it took against the plaintiff.

 The plaintiff in a Title VII disparate treatment case "must establish a prima facie case of unlawful discrimination by showing that 1) she is a member of a protected class 2) who performed her job satisfactorily (or who was qualified for a new position) 3) who [suffered an adverse employment action] 4) under circumstances giving rise to an inference of discrimination (or retaliation)." *Stratton v. Dept. for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997). *See also Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997).

 There is no dispute that the plaintiff is a member of a protected class. However, the defendant contends that the plaintiff was not "otherwise qualified" for the position, that the plaintiff was not discharged but resigned voluntarily, and that the plaintiff can not establish that the adverse employment actions she suffered occurred under circumstances giving rise to an inference of discrimination. "The burden that [a Title VII] plaintiff must meet in order to defeat summary judgment at the prima facie stage is not onerous, and

---

**6.** It should be noted, however, that "[t]hrough the use of constructive discharge, the law recognizes that an employee's 'voluntary' resignation may be, in reality, a dismissal by an

employer." *Brittell v. Dept. of Correction,* 247 Conn. 148, 717 A.2d 1254, 1270 (1998) (internal citations omitted).

has been described as de minimis." *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir.2000) (internal quotation marks and citations omitted).

As to the second element of a prima facie case, the Second Circuit has stated:

[W]e have long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision. To show "qualification" sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance. Instead, she need only make the minimal showing that she possesses the basic skills necessary for performance of the job. The role of the qualification prong is simply to help eliminate the most common nondiscriminatory reasons for the plaintiff's rejection. It cannot be more than that.

In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified. Moreover, when, as in this case, the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened.

*Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir.2001) (internal quotation marks and citations omitted). *See also de la Cruz v. New York City Human Resources Admin. Dept. of Social Servs.*, 82 F.3d 16, 20 (2d Cir.1996); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 92 (2d Cir.

2001). It is undisputed that the plaintiff was hired by the defendant and promoted during her tenure. There is no evidence in the record that Gupta was subjected to any disciplinary action at work prior to 1998. Thus, the plaintiff has met her de minimis burden of establishing this prong of a prima facie case.

As to the third element of a prima facie case, the defendant argues that the plaintiff's claim must fail because she resigned her position voluntarily, and was not discharged. However, an employee need not be discharged in order to suffer an adverse employment action. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) ("[S]uspension without pay is sufficient to constitute an adverse employment action in this context.").

As to the fourth element of a prima facie case, the plaintiff has presented evidence that Callahan referred to her in a derogatory manner based on her race and/or national origin. In addition, there is substantial evidence from which a jury could conclude that the City lacked a good faith basis to deny the plaintiff sick leave, including evidence that the agents of the defendant received many notes from Gupta's doctors in India stating that Gupta had been diagnosed with typhoid fever, was too sick to travel, and had suffered a relapse, and that Callahan himself observed that the plaintiff appeared to be weak upon her return to work. Yet, Callahan did not accept the explanations from the plaintiff, several members of her family, and the Indian doctors who averred to the plaintiff's condition. Thus, the court finds that the circumstances surrounding the adverse employment actions taken against the plaintiff give rise to an inference of discrimination. Therefore, the plaintiff has satisfied her burden as to the fourth element of the prima facie case.

The process for evaluating a Title VII claim at the summary judgment stage has been described recently as follows:

Even if the plaintiff succeeds in presenting a prima facie case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action. Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture. For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock,* 224 F.3d at 42 (internal citations, quotation marks, and footnote omitted).

 The City contends that Gupta was disciplined because of insubordination, "excessive, sporadic absences", because she failed to return to work after a leave of 18 weeks, and because she did not keep in contact with the City and inform her supervisors of when she expected to return to work. However, as discussed above, in addition to the evidence that Callahan referred to her in a derogatory manner based on her race and/or national origin, the plaintiff has produced evidence, *inter alia,* that could support a conclusion that the City lacked a good faith basis to deny her sick leave. Accordingly, the court concludes that genuine issues of material fact exist as to whether the plaintiff was subjected to intentional discrimination by the defendant, and the motion for summary judgment as to this count is being denied.

## IV. *CONCLUSION*

The defendant's Motion for Summary Judgment [Doc. # 41] is hereby GRANTED as to the Fourth and Fifth Counts, and hereby

DENIED as to the First, Second, Third, and Sixth Counts.

It is so ordered.