**BRUNSON**

v.

**BAYER CORP.**

No. 3:01CV353(JBA).

United States District Court, D. Connecticut.

Dec. 27, 2002.

W. Martyn Philpot, Jr., Laura Lee A. Dorflinger, Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for Plaintiff.

Eric M. Grant, Keith P. Zanni, Yamin & Grant, Waterbury, CT, Stacy Allen, Leila Feldman, Karen A. Monsen, Jackson Walker, Austin, TX, for Defendant.

### *Ruling on Defendant's Motion for Summary Judgment [Doc. # 47]*

ARTERTON, District Judge.

Audrey Brunson's claims against her former employer, Bayer Corporation, of Title VII sex and race discrimination, retaliation, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision, are challenged on motion for summary judgment by Bayer. Bayer's motion is denied as to Brunson's sex discrimination and negligent supervision claims and granted as to the remainder of her claims.

I. Factual Background[1]

A. Bayer's Policies and Procedures with Regard to Sexual Harassment

Bayer Corporation's policy on equal employment opportunity in its employee manual provides:

The law prohibits harassment of another employee because of the employee's race, color, religion, sex, national origin, age, disability or, in some states, sexual orientation. The company will not tolerate unlawful harassment of its employees—in any form. Harassment is a form of discrimination that violates the law and company policy.

If you believe that you have experienced sexual harassment, or if you observe the sexual harassment of another employee, you should report that behavior to your immediate supervisor, the manager of the department, your local human resources representative, or the corporate or site EEO department.

All reports of sexual harassment will be promptly investigated. If the company determines that there has been a violation of the sexual harassment policy, appropriate disciplinary action will be taken. This disciplinary action may include termination.

Bayer Salaried Employee Handbook [Doc. # 48 Ex. E2] at 10–11 (emphasis omitted). A subsequent section of the handbook, titled "If you have a complaint," contains Bayer's anti-retaliation policy:

You are encouraged to discuss your concerns with your supervisor. The company intends to earnestly attempt to resolve employee complaints promptly and equitably and assures that you will not be retaliated against for expressing your concerns or using the complaint procedure.

---

1. Except where otherwise noted by citation to another source, the following facts are taken from the undisputed portions of the parties' Local Rule 9(C) Statements, and are presented in the light most favorable to Brunson, the non-moving party.

*Id.* at 45. Don Taylor, director of Human Resources at Bayer, explained that the complaint procedure, with its four point persons, "is put in place to have an expeditious means to resolve complaints[,]" Taylor Dep. at 71, while still providing safeguards for an employee who may not feel comfortable approaching his or her immediate supervisor:

[A]n employee who feels uncomfortable [going] through their supervisor, has a means through the complaint procedure to go to the next level, which is Human Resources .... And that's why those safeguards are put into the procedure, to provide an employee the opportunity, for whatever reason, if they feel uncomfortable to go to their immediate supervisor, to go through other means within the corporation, specifically, Human Resources, as the advocate for the employee.

*Id.* at 63.

In addition to Bayer's stated policy with its four "point persons," the company requires all supervisors to report incidents of sexual harassment to management:

Any supervisor, manager or employee who receives a complaint of sexual harassment or witnesses such behavior in the workplace must promptly report the incident to the site human resources department.

\* \* \* \* \* \*

As management personnel, you set the tone or appropriate atmosphere for the workplace \* \* \* If you observe or are made aware of inappropriate conduct or actions that may be perceived as sexual harassment, you must contact the site human resources department or corporate EEO department for assistance in clarifying sexual harassment issues and planning appropriate action.

Employee Relations Handbook, § 2.9 (Sexual Harassment) at 1–2 [Doc. # 48 Ex. A4]. Taylor explained:

Q: Do supervisors have a responsibility to report immediately sexual harassment when they are advised of it?

\* \* \* \* \* \*

A: Supervisors and managers are expected to respond if they believe a situation of sexual harassment has occurred, yes.

\* \* \* \* \* \*

Q: Promptly?

A: Yeah, we would expect promptly. Yes.

\* \* \* \* \* \*

Q: Are there any circumstances from your view, sir, which would make it appropriate for a manager or supervisor to fail to report an incident of sexual harassment when he or she learned of it?

\* \* \* \* \* \*

A: No.

Taylor Dep. at 186–187. Supervisors at Bayer were trained in dealing with allegations of sexual harassment, and at least the principal supervisor at issue in this case (Lynn Boland) understood that it was her responsibility as a supervisor to notify either human resources or an individual higher in the hierarchy of allegations of sexual harassment. Boland Dep. at 79.

**B. Brunson's Complaints of Sexual Harassment**

Brunson, a 47–year–old African–American woman, worked at Bayer or its predecessor since 1984, most recently as an auditor-inspector in the packaging area. Prior to December 1998,[2] one of Brunson's co-workers, Lewis White, made unwelcome

**2.** In her deposition testimony, Brunson stated variously that the conduct began in 1997 and that it began in September 1998. *See* Brunson Dep. at 39, 55–56. However, both the Amended Complaint and her sworn Affidavit

comments and gestures of a sexual nature to Brunson. Although Brunson had a copy of Bayer's handbook, at no point before December 1998 did she report White's conduct to any of the individuals identified in Bayer's written policy on sexual harassment. Instead, Brunson spoke with two other supervisors, Lynn Boland and Tina Keating.

Brunson's deposition testimony on the substance of her conversations with Boland is contradictory. At one point, Brunson testified that she told Boland that she wanted to handle the situation herself. *See* Brunson Dep. at 62 ("Q: Do you recall during those other instances [prior to December 1998] when you talked to Lynn Boland telling her that you—as you just pointed out, that you were going to try to ignore him or that you were going to try to talk with him or deal with it yourself before you wanted to take it to the next level of actually making a complaint against him? A: Yes."). At another point, she testified that during her September 1998 conversation with Boland, she told Boland that Boland should talk to White's supervisor. Brunson Dep. at 52, 59.[3] Brunson's testimony is unequivocal, however, that she never asked Boland to take the complaint to upper management until early December 1998. *Id.* at 60, 61. The references in the record about Brunson's con-

versations with Keating are sparse; there is no evidence that Brunson told Keating that she wanted to make a complaint about White, but she did ask Keating to speak with White. *Id.* at 58.[4]

The severity of White's harassment escalated over time. *Id.* at 49. In early December 1998, a particularly egregious incident allegedly occurred, which Brunson relayed to Boland, and Boland was "adamant that a complaint needed to be made about White's conduct." Brunson Dep. at 62–63.

Q: * * * I understood from your earlier testimony about this meeting in December that what you said was that she told you when she heard about this latest incident of conduct on the part of White, that she couldn't hold back anymore and that she had to tell somebody in management and she really wanted you to allow her to do that, and then you actually did say, 'Yes, you can go ahead and do that.' Is that a fair statement of what happened in that conversation?

A: Yes.

*Id.* at 64. Boland filed a written complaint to the human resources department on Brunson's behalf, and Brunson was "immediately" moved from the packing floor (where White worked) to another area of

---

of Illegal Discriminatory Practice submitted to the CHRO assert that the conduct "began" "[i]n or about September, 1998," Second Am. Compl. ¶ 7; CHRO Aff. ¶ 4 [Doc. # 48 Ex. B1]. The commencement date of September 1998 for the inappropriate behavior was repeated in questions to Brunson, and she gave no indication that this date of commencement was incorrect. *See id.* at 33, 40, 42–44, 49.

3. While Bayer argues that Brunson's account of Boland's response (that White's supervisor was not going to take action unless Brunson herself made a complaint to him) is hearsay, it may be admissible at trial as an admission under Fed.R.Evid. 801(d)(2)(A), by virtue of

Boland's supervisory capacity and concomitant duty to report sexual harassment. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (hearsay evidence may be used to defeat summary judgment upon "a showing that admissible evidence will be available at trial").

4. Defendant's assertion at oral argument that the record was devoid of any complaint to Keating of *sexual harassment* (as opposed to a pushing incident) is not borne out by the record. *See* Brunson Dep. at 55 (Brunson told Keating about White's comments about her lipstick, perfume and appearance).

the company. *Id.* at 70. She went on her Christmas vacation shortly thereafter, and cannot recall ever seeing White at work again. *Id.* at 80.

Following Boland's filing, "Bayer conducted a thorough investigation of the allegations of sexual harassment made by [Brunson] against White," who was placed on a paid leave of absence pending the outcome of the investigation. Statement of Undisputed Facts ¶¶ 4–5 [Doc. # 12].[5] As a result of this investigation, White's employment was terminated on January 19, 1999.[6] *Id.* ¶ 6.

### C. Other Complaints About White

In addition to the evidence of White's harassment of Brunson, there is evidence in the record of White harassing other women at Bayer and of supervisors at Bayer being aware of such alleged harassment. Specifically, the record contains evidence of White's inappropriate conduct towards Virginia Marcelli (reported to supervisor Lynn Boland), Lenore Santiago (reported to supervisor Ed Purdie) and Inell Shaw (reported to supervisor Tina Keating).

#### 1. Marcelli

During the course of Bayer's investigation into Brunson's complaints, Don Taylor compiled an investigative file that included the complaints of several other women, [Doc. # 51 Ex. 6], including Virginia Marcelli. It is summarized in Taylor's January 16, 1999 notes:

[Marcelli] was not sure what may have been said between [Brunson] and [White]. She did say something should have been done about [White] a long time ago. [White] is always falling asleep at work. [White] had said to [Marcelli] "If we make babies, they'd be beautiful." This statement was made many months ago. [Marcelli] said to [White] "No, it will never happen." He was fooling around but I don't like him. [Marcelli] said [White] once said to her "You're lucky I don't get in your face (pointing at her)." It happened sometime before Christmas. Both she and [White] were pulled into the office about the situation (met with Lynn Boland). He said in the meeting "I'm black and I can get away with it."
[Marcelli] said "He has a medical problem but he starts things with me. He's called me a 'moose' before. This man has gotten away with too much." (She began to cry at this time.)

[Doc. # 51 Ex. 6]. Support for defendant's assertion at oral argument that Bayer had no notice of Marcelli's claims prior to December 1998 is not found in the record: although Taylor's notes are dated January 1999, Marcelli's recollection of discussing White's behavior with supervisor Boland is undated.

#### 2. Lenore Santiago

Lenore Santiago testified at her deposition that in 1997 White had made a comment about McDonald's twice,[7] with the

---

5. Despite plaintiff's earlier agreement to this undisputed fact, plaintiff's Local Rule 9(c)(2) statement denies it, but points to no contrary evidence impugning the thoroughness of Bayer's investigation.

6. Plaintiff's opposition brief makes much of the fact that Taylor allegedly was willing to retain White if White would admit his wrongdoing. Since the undisputed evidence is that White's employment was terminated, and Brunson stated that she never saw White

again at work, Taylor's inclination has no bearing on disposition of this motion.

7. Although the pages from Santiago's deposition that have been submitted by the parties do not include any description of the McDonald's comments, it can be inferred from the context that White asked Santiago to meet him at McDonald's. *See* Santiago Dep. at 32 (Santiago "turned [White] down").

second request containing "a little attitude." Santiago Dep. at 34–35. Santiago reported the comments, which she described as "harassment," to White's supervisor, Ed Purdie, and the comments stopped. *Id.* at 37. However, White angrily confronted Santiago about her complaint to Purdie, and they engaged in a yelling match. *Id.* at 45. Extra supervisors were then stationed in the time clock area for several days as a precaution. *Id.* at 48, 50.

Santiago maintained that she never reported any instances of "sexual harassment"—only general harassment:

Q: * * * Have you ever made a complaint to human resources about being sexually harassed?

A: No.

Q: And did—have you ever talked to Don Taylor concerning an incident involving an employee at Bayer that you thought was improper?

A: Yes. * * * The individual was Lewis White and the incident that I had with him was—I don't know how you'd want to call it—drastic comments.

Santiago Dep. at 27; *accord id.* at 39 (Santiago explained to White that she had only reported him to Purdie for harassment, not sexual harassment). Similarly, when Taylor specifically asked Santiago if her complaint was of sexual harassment, she replied in the negative, and Taylor did not believe that Santiago had complained about sexual harassment. Taylor Dep. at 182–183. Later, during questioning from Brunson's attorney which clarified that sexual harassment includes a hostile work environment, Santiago agreed that some of White's conduct amounted, in her view, to sexual harassment. Santiago Dep. at 64.

3. Inell Shaw

Shaw testified that the following incident allegedly occurred in front of a co-worker:

A: And [White] came up behind me, and he touched me on my butt.

Q: When you say—when you say he touched you, did he grab you? Did he hit you?

A: No. He rubbed his hand.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: What happened?

A: Then I slapped him.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: All right. And you slapped him. What did he say?

A: Well, he walked away, and then he came back. And he apologized. He said he was sorry.

Q: Okay, and did you accept his apology?

A: Yes, I did.

Q: And was that the end of it?

A: Yes.

Q: Did you ever report it to anyone?

&ast; &ast; &ast; &ast; &ast; &ast;

A: No.

Q: Did you ever tell, for instance, [Keating] about what had occurred?

A: I didn't go and tell Tina. She came to me because I guess she asked me what was wrong * * * [b]ecause I was just standing there looking mean.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: And you told her what?

A: I told her that [White] touched me and I slapped him. * * * She asked me what I wanted to do, and I said "nothing" * * * [b]ecause I felt like I had taken care of it.

Shaw Dep. at 42–45. Shaw further testified that she was satisfied with Keating's response to the situation because she felt an apology was sufficient. *Id.* at 47. She

further testified that she did not consider White's contact to be sexual harassment, either at the time it occurred or at the time of her deposition, *id.* at 47–58, and that she would have resented Keating if Keating had reported the incident to higher management, *id.* at 59.

### D. Events Subsequent to Brunson's December 1998 Complaint of Harassment

When she allowed Boland to report the harassment, Brunson feared that her African American colleagues might think poorly of her, a salaried African American employee, reporting the offensive conduct of an hourly African American employee:

> [B]ecause of the fact that I was in a salary management position, I should be more tolerant of what was said by my own, [ ] meaning anyone that was African American, I should be more tolerant of them because I was in a position and they were just mere workers.

Brunson Dep. at 81. Brunson's fears were apparently warranted, because after action was taken against White, some African American hourly employees from White's department "ostracized" her. *Id.* at 81, 86. One employee told Brunson that Brunson's mother would have handled the situation differently. *Id.* at 87–88. Some Hispanic employees stated "We would never turn in our own people no matter what they did to us." *Id.* at 140. This conduct which Brunson terms retaliation occurred between January 8, 1999, when White was placed on leave, and March 1, 1999, when Brunson stopped work.

The only supervisory employee who is claimed to have acted adversely to Brunson was Tina Keating, who was angry because Bayer's upper management found that she had failed to report Shaw's experience with White to the Human Resources department:

> Q: * * * Just to be clear, so then it's your view that Keating's anger at you was not because she was upset that Lewis White had been turned in or fired, but because she was upset that she may have been identified as someone who had done something wrong?
>
> A: Right.
>
> Q: Okay. Did she ever mention it to you again after the locker room incident?
>
> A: No. She apologized. She made her apology. She made her apologies to me * * *

*Id.* at 142–143.

Although Taylor had told Brunson to report any retaliation to him, Brunson failed to do so until her final day at Bayer, Taylor Dep. at 146–147, and instead reported only to one of her supervisors. Brunson Dep. at 91–93. When Brunson eventually reported the incidents to Human Resources, Bayer offered to hold a professionally-conducted conflict management class with Brunson and her coworkers,[8] but Brunson refused to participate, claiming that as the victim she did not feel she should have to participate. Brunson Dep. at 96–97.

Bayer conducted an investigation, including interviews with 34 employees in Brunson's work area, and found no substantiation of Brunson's claim of retaliation. Taylor Aff. ¶ 29.[9] Nonetheless, Bayer conducted additional training. *Id.* ¶ 30. In May 1999, after Brunson had stopped

---

8. Unchallenged Local R. 9(c) Statement ¶ 20.

9. While plaintiff's Local R. 9(c)(2) statement denies this assertion, she points to no evidentiary basis for her denial, either in the 9(c) statement or the statement of facts in her opposition, other than her own reports to Human Resources about the alleged retaliation.

working, Bayer offered her the option of returning to a position that was not on the packaging floor, where the allegedly retaliating coworkers worked, but she refused this position,[10] because she would still have to eat lunch in their area, which was unacceptable to her. Brunson Dep. at 135.

Q: * * * So your position was—just so I understand it, your position was that you were not going to come back to work at Bayer unless they could find you a place in a completely different building that would so isolate you from these other former coworkers that you would have no daily contact with them at all?

A: Right.

*Id.* at 136.

## II. Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.2001); *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219, 1223–1224 (2d Cir. 1994).

The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be suffi-

cient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (citation and internal quotation omitted). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Id.* However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted).

## III. Analysis

### A. Sexual Harassment

Brunson's Title VII sex discrimination claim is based on her claim that harassment by White, a co-worker, created a hostile work environment. In order to prevail, she must establish both existence of a hostile work environment and a specific basis for imputing White's conduct to Bayer. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998) (*citing Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996)). For the purposes of this motion, Bayer concedes the existence of a hostile environment and challenges only whether White's conduct can be imputed to it.

"When a co-employee—as distinct from a supervisor—is alleged to have en-

**10.** Unchallenged Local R. 9(c) Statement ¶¶ 24–25.

gaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998) (*citing Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995)) (internal quotations omitted); *cf. also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). If this were a case of sexual harassment by a supervisor, Bayer would be "presumptively liable" for White's harassment, subject to proof of the *Faragher/Ellerth* affirmative defense of (1) Bayer's reasonable care to prevent and promptly correct any such harassment, and (2) Brunson's unreasonable failure to avail herself of Bayer's corrective or preventative opportunities. *Quinn*, 159 F.3d at 767 (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257). Because this is not a case of supervisory harassment, Bayer need not prove that Brunson unreasonably failed to avail herself of its complaint procedures; rather, Brunson has the burden of proving that Bayer was "negligent, that is, [ ] it either 'provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 441 (2d Cir.1999) (*quoting Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)).

"Under Title VII, an employer need not have actual knowledge of the harassment; an employer is considered to have notice of sexual harassment if the employer—or any of its agents or supervisory employees—knew or should have known of the conduct." *Distasio*, 157 F.3d at 63 (*citing Murray*, 57 F.3d at 249).

An official's knowledge will be imputed to an employer when: (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.

*Id.* at 64 (*citing Torres v. Pisano*, 116 F.3d 625, 636–637 (2d Cir.1997)); *see also Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir.1997).

Here, Brunson testified that she complained of sexual harassment to two supervisors, Tina Keating and Lynn Boland. The first basis of imputed knowledge under *Distasio*, which requires the harassment to come to the attention of someone "within that class of an employer organization's officials who may be treated as the organization's proxy," *Faragher*, 524 U.S. at 789, 118 S.Ct. 2275,[11] cannot be satisfied here because there is no evidence that either Boland or Keating, who appear to be factory floor supervisors in a large corporation, could fit this description. *Distasio*'s second basis of imputed knowledge, applicable when harassment comes to the attention of someone with the power to stop the harassment, is also inapplicable because neither woman was either White's supervisor or Brunson's supervisor at the time of the harassment complained of.[12]

---

11. (*citing, inter alia, Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992) (owner of company); *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir.1983) (proprietor, partner or corporate officer))

12. Brunson's deposition testimony indicates without time reference that Keating "had been [White's] supervisor in the past." Brunson Dep. at 56. Additionally, Brunson's vague reference to Boland and Keating having "control" over White, *id.* at 55 ("I talked

*See Torres*, 116 F.3d at 637.[13]

The third *Distasio* basis of imputed knowledge, however, could be found by the jury to be applicable in this case, on the evidence that Keating and/or Boland, as supervisors at Bayer, were "charged with a duty to inform the company of the harassment." *Distasio*, 157 F.3d at 64. In *Distasio*, plaintiff's report of sexual harassment to her group leader Angel was sufficient to charge the employer with knowledge based on defendant's sexual harassment policies:

> Angel's knowledge is ... imputed to Perkin Elmer [because Angel] had a responsibility to relay sexual harassment complaints to the company under the express policy promulgated by the company. *See* Restatement (Second) of Agency § 275 (1958) ("the principal is affected by the knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information"). An employer will be liable based on the knowledge of an employee, who may or may not have management authority, if that employee "has an official or strong de facto duty to act as a conduit to management for complaints about work conditions," *Torres*, 116 F.3d at 637 (*quoting Lamb v. Household Credit Servs.*, 956 F.Supp. 1511, 1517 (N.D.Cal.1997)), or is responsible for relaying harassment complaints to the corporate hierarchy. The Perkin Elmer company policy directs supervisors, after receiving a harassment complaint, to: ["]inform the Human Resources Department of allegations of sexual harassment by employees or non-employees within 24 hours of the reporting of the incident, and assist, as requested, with the investigation of such allegations.["] In light of this policy, requiring Angel to inform the company of reported harassment that came to his attention, Perkin Elmer is charged with knowledge of the harassment to the same extent as Angel. *See Torres*, 116 F.3d at 637.

*Distasio*, 157 F.3d at 64 (alterations omitted). Based on Bayer's handbook, as well as Taylor's and Boland's testimony that supervisors at Bayer are obligated to report sexual harassment to management, a jury could conclude that Boland and Keating, as supervisors, were under a duty to relay reports of sexual harassment to Bayer, thus their knowledge is imputed to Bayer.

■ Bayer maintains that under *Torres*, Boland was reasonable in acceding to Brunson's request that Boland not report the harassment. *See Torres*, 116 F.3d at 639 ("On these facts, it must be said as a matter of law that Pisano behaved reasonably in honoring Torres' request for confidentiality and in failing to act immediately

---

to the female supervisors, which were [Keating and Boland], and on the packaging floor because they had control over [White] ..."), appears to refer to Keating's and Boland's general status as supervisors, as Brunson next refers to Keating as White's *former* supervisor, *id.* at 56, and later recounts an event in which Boland allegedly went to speak with White's supervisor, *id.* at 59. Brunson's passing reference to Boland's and Keating's "control," then, cannot be construed as their "authority to hire, fire, discipline, or transfer him," *Torres*, 116 F.3d at 637, and the record lacks any evidence indicating that Boland or Keating have such authority.

13. "[W]here the person who gained notice of the harassment was the supervisor of the harasser (e.g., had the authority to hire, fire, discipline, or transfer him), knowledge will be imputed to the employer on the ground that the employer vested in the supervisor the authority to terminate the harassment." (citations omitted). *But cf. id.* at n. 16 (whether a harasee's supervisor's knowledge will be imputed to the employer is an open issue in the Second Circuit).

to end the harassment.") However, Brunson's testimony, taken in the light most favorable to her, is that she asked Boland to speak with White's supervisor about the harassment,[14] did not request that Boland keep the complaints confidential, and did not ask Keating not to share her complaints with higher management. *Compare* Boland Dep. at 88, 109 ("She didn't ask me to keep it a secret.") *with Torres*, 116 F.3d at 638–639 ("Pisano explained his understanding of [Torres'] request[:] ... 'She specifically wrote in the letters, I'm afraid, please don't say anything to anyone.' "). Brunson's evidence could also be found to demonstrate a pattern of harassment possibly affecting others of which Bayer had imputed knowledge and failed to prevent, distinguishing it from *Torres*:

> [T]here may be cases in which a supervisor or co-worker is harassing a number of employees, and one harassed employee asks the company not to take action. In those cases, the employer's duty to the other employees would take precedence, and the company would most

likely not be justified in honoring a single employee's request not to act. But that too is not this case.

*Torres*, 116 F.3d at 639;[15] *see also Malik*, 202 F.3d at 106 ("Prudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment.").

Although none of the earlier complainants considered that White's conduct was "sexual harassment," at the time it occurred, reasonable jurors could conclude that trained supervisors would find the descriptions of such conduct toward female employees potentially indicative of problematic behavior such that Bayer should have been on notice of White's apparent proclivity for sexually inappropriate behavior, and Bayer's lack of response was negligent. *See Malik*, 202 F.3d at 107 ("An employer's conduct of [a sexual harassment] investigation and determination of its scope must be viewed ex ante and take into account that, from the employer's viewpoint, *worst-case scenarios* must govern its conduct.") (emphasis added).[16] In-

---

**14.** While Bayer vociferously objects to Brunson's alternative versions of her conversations with Boland, *compare* Brunson Dep. at 62 (agreeing that she told Boland she wished to handle the situation herself) *with id.* at 52, 59 (claiming that she told Boland to speak with White's supervisor), the two accounts are not inevitably in conflict, as Brunson could have been willing to handle the situation herself without involving upper management, and yet still desire intervention by White's floor-level supervisor.

Defendant's repeated objection ("Plaintiff cannot use her own pleading to establish a fact issue. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.") is unsupported by *Celotex*. While "[i]t is beyond cavil that a party may not create an issue of fact by submitting an *affidavit* in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony," *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir.1999) (citations and quotations omitted, emphasis added), defendant points to no authority for the proposition that Brunson's contradictory de-

position testimony must similarly be disregarded.

**15.** "There is certainly a point at which harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to do so by a terrified employee. But that is not this case. There are, for example, no allegations here of any serious physical or psychological harm that would have occurred if the employer did not act forthwith. And the law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay—at least for a time—pursuing harassment claims, perhaps for privacy or emotional reasons, until they are ready to do so."

**16.** There is no genuine issue of fact for trial, however, as to whether Bayer provided a reasonable avenue for complaints about sexual harassment, which is a separate recognized theory of negligence. *See Richardson*, 180

asmuch as Bayer does not challenge at this stage the severity or pervasiveness of the harassment, summary judgment must be denied on Brunson's sex discrimination claim.

### B. Retaliation

Brunson next asserts that Bayer failed to take reasonable steps to prevent her co-workers from retaliating against her after she complained of White's conduct. Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's opposition to any practice made unlawful by Title VII or because the employee "made a charge, participated in any manner in an investigation, proceeding, or hearing" alleging discrimination proscribed by Title VII. 42 U.S.C. § 2000e–3(a). Claims of retaliation under Title VII are analyzed under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), burden shifting framework, which requires a plaintiff prove, *inter alia*, that she suffered an adverse employment action. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177–1178 (2d Cir.1996). As explained below, the evidence offered in support of both of Brunson's claims of adverse employment actions is insufficient under Rule 56.

### 1. Co–Worker Harassment

▬ An adverse employment action can be proved by showing that the employer "knew but failed to take action to abate retaliatory harassment inflicted by co-workers," and such harassment constituted a "materially adverse change in the terms and conditions of employment." *Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 446 (2d Cir.1999) (citations and internal quotations omitted). With the exception of the Keating incident, which Brunson concedes was a one-time confrontation and was related primarily to Keating's displeasure over having been discovered to have violated her own reporting duties, all of· the retaliatory conduct claimed is alleged to have been perpetrated by hourly workers outside of Brunson's department. When the Human Resources Department was notified, Bayer offered to conduct specialized training, conducted a 34–employee investigation, offered Brunson another job that would not involve working with the alleged retaliators, and conducted additional training.

Brunson claims that Bayer was on notice of the retaliation the first day it began, when she reported it to her immediate supervisor, and that Bayer's remedial steps were both too little (asserting that Bayer should have offered her a job in an entirely different area of the plant) and too late (asserting that remedial steps should have been taken after her report to her immediate supervisor). Both claims are unavailing. Taylor explicitly told Brunson to report incidents of retaliation to him, which she failed to do. *See* Taylor Dep. at 146–148. Bayer's policy mandating reporting of sexual harassment does not extend to reporting retaliation, thus the knowledge of the supervisor to whom Brunson reported retaliation is not imputed to Bayer under *Distasio*. Brunson admits that she did not ask the supervisor to do anything about the alleged retaliation, and the "cold shoulder" retaliation is not so severe or pervasive that the supervi-

---

F.3d at 441 (an employer is negligent if it either knew of the harassment but did nothing about it *or* provided no reasonable avenue for complaint). While Brunson asserts that any complaint to any supervisor should suffice, she offers no evidence or authority for her claim that Bayer's multi-layered, comprehensive complaint procedure was deficient.

sor's failure to take remedial action on her own initiative evidences negligence. In the absence of sufficient evidence from which a reasonable jury could conclude that Bayer knew about but failed to take action to abate "retaliatory harassment" that constituted a "materially adverse change in the terms and conditions" of Brunson's employment, this claim of adverse employment action fails.

### 2. "Discharge"

 Brunson also claims discharge as an adverse employment action. The record clearly belies such a claim, in that it is undisputed that Bayer was not dissatisfied with Brunson's job performance and wanted her to return to work. *See* Unchallenged Local R. 9(c) Statement ¶ 21. When Brunson's medical leave of absence expired on August 17, 1999, Bayer offered to extend her personal leave through September 1999, noting in a letter to her attorney:

> Bayer continues to offer Ms. Brunson the option of returning to her former position as a Quality Assurance Auditor or to a comparable position as a Quality Assurance Documents Records Specialists [sic], where she will not be in contact with her former colleagues. * * * If she declines Bayer's offer of Personal Leave, her employment will be terminated as of Tuesday, August 31, 1999, for failure to return from her Family and Medical Leave.

[Doc. # 48 Ex. E6]. Notwithstanding Brunson's failure to accept this offer, her employment was not actually terminated until September 2000, when Bayer determined that she had abandoned her job. [Doc. # 48 Ex. E7] at 2. On this record, no jury could conclude that Brunson was discharged from her employment. As Brunson cannot establish either claimed adverse employment action, Bayer is entitled to summary judgment on the retaliation claim.

### C. Race Discrimination

Brunson claims that Bayer's failure to take earlier action against White constituted race discrimination because Bayer waited until she, an African American employee, complained, rather than acting earlier. Brunson points to Boland's alleged statement that Boland was concerned about White "playing the race card" and was thus reluctant to discipline him. Liberally construed, Brunson's argument is two-fold: (1) but for Bayer's hesitancy to take action earlier against White (because he is black), she would not have been victimized by him; and (2) because Brunson is black and complained, Bayer decided to take action against White. Neither formulation of this claim can succeed.

### 1. Inaction Based on White's Race

 Liability for employment discrimination depends on whether the *plaintiff's* protected trait actually motivated an employer's adverse employment action. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) ("Whatever the employer's decision making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."); 42 U.S.C. § 2000e–2(a)(1) (making it an unlawful employment practice "to discriminate against any individual ... *because of such individual's* race, color, religion, sex, or national origin") (emphasis added); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, Bayer's alleged failure to take action against White because of White's race cannot constitute discrimination against Brunson on account of her race.

### 2. Action Based on Brunson's Race

■■■■ The second formulation of Brunson's argument is that Bayer took action against White because she, the complainant, was black. The evidence of this claim, however, fails to show any *adverse* employment action by Bayer. If Brunson's assertion that Bayer only took action against White at the time he was accused by a black employee is proved, then Brunson will have proved that Bayer took action against her harasser in response to her complaints, which is to her benefit, not her detriment. While Brunson asserts that some African–American workers at Bayer made her a scapegoat and blamed her for White's discharge, there is no basis for imputing this conduct to Bayer.[17] Thus, Brunson's prima facie case of race discrimination fails in the absence of proof of an *adverse* employment action based on her race. *See, e.g., Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999) (adverse employment action required for prima facie case of race discrimination).

### D. Intentional Infliction of Emotional Distress

Brunson also claims intentional infliction of emotional distress in Bayer's handling of her complaints and its "guilty knowledge" of White's propensity for harassment inferable from its actions and its imputed knowledge. Bayer argues, *inter alia*, that its conduct cannot be characterized as "intentional."

In *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986), the Connecticut Supreme Court explained the elements of a claim for intentional infliction of emotional distress:

> It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Id.* at 253, 510 A.2d 1337, *citing, inter alia,* Restatement (Second) of Torts § 46 (quotations omitted). Because *Petyan* is founded upon and incorporates § 46 of the Restatement (Second) of Torts,[18] the "knew or should have known" mental state it articulates must be read within the Restatement's formulation, the commentary of which provides:

> The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, as that term is defined in § 500, in deliberate disregard of a high degree of probability that the emotional distress will follow.

cmt. I. Thus, there is no basis for concluding that the Connecticut Supreme Court intended to engraft a simple negligence standard onto this intentional tort.

■■■■ Even taken in the light most favorable to Brunson, nothing in the record would allow a jury to conclude that Bayer's actions and alleged omissions were taken:

---

**17.** In order for co-worker harassment or retaliation to constitute a hostile work environment for purposes of establishing a prima facie case against an employer, there must be some basis for imputing such behavior to the employer. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted).

**18.** When setting out the elements of the tort, *Petyan* quoted *Murray v. Bridgeport Hosp.*, 40 Conn.Supp. 56, 62, 480 A.2d 610 (1984) and *Hiers v. Cohen*, 31 Conn.Supp. 305, 329 A.2d 609 (1973), which both cite to § 46 of the Restatement.

(1) with the intent to cause Brunson emotional distress; (2) with the substantial certainty that such distress would result; or (3) recklessly, in deliberate disregard of a high degree of probability that the emotional distress would follow. Boland's inaction, whether or not violative of company policy, was at the request of Brunson, and while Keating may have been less than helpful when confronted with Brunson's complaints, there is nothing in the record to suggest any motivation other than negligence on her part. Bayer's investigatory and remedial efforts in Marcelli's, Shaw's and Santiago's cases further eliminate any basis from which a jury could conclude that Bayer's alleged failure to investigate or warn others about White was intentional or reckless as those term are used in § 46 of the Restatement.

### E. Negligent Infliction of Emotional Distress

Brunson also alleges that Bayer's conduct constitutes negligent infliction of emotional distress. In *Perodeau v. City of Hartford*, 259 Conn. 729, 792 A.2d 752 (2002), the Connecticut Supreme Court concluded that recovery for negligent infliction of emotional distress is not allowed in the context of an ongoing employment relationship. *See id.* at 762–763, 792 A.2d 752. While *Perodeau* holding eliminates such claims against individual defendants, *see id.*, this Court finds no reason to read it as nonetheless permitting recovery against the corporate employer, because (1) the question certified to the court concerned only individual defendants, *id.* at 731, 792 A.2d 752, (2) the reasoning of *Perodeau* is for the most part equally applicable to corporate defendants,[19] and (3)

every court applying the reasoning of *Perodeau* has recognized *Perodeau* as barring such a cause of action against corporate defendants. *See Matos v. Bristol Bd. of Ed.*, 204 F.Supp.2d 375, 377 n. 1 (D.Conn. 2002); *Gupta v. City of Norwalk*, 221 F.Supp.2d 282 (D.Conn.2002); *Martinez–Ruiz v. Centimark Corp.*, No. CV010510719S, 2002 WL 853605 (Conn.Super. April 9, 2002); *Cole v. Moorehouse*, No. CV990427337S, 2002 WL 31304178 (Conn.Super. Sept. 18, 2002); *Saltzman v. Trailblazers Acad., Inc.*, No. CV020187929, 2002 WL 31255758 (Conn.Super. Sept. 10, 2002); *Boccuzzi v. Stamford Health Sys.*, No. CV010183441, 2002 WL 1041346 (Conn.Super. May 2, 2002); *Leone v. New England Communications*, No. CV010509752S, 2002 WL 1008470 (Conn.Super. April 10, 2002).

 While Brunson claims that her negligent infliction of emotional distress claim "incorporate[s] her discharge," [Doc. # 51] at 38, she explains this statement by the following: "Plaintiff's complaint does not allege negligent infliction of emotional distress arising out of her refusal to return to work, essentially because she never refused to return to work." *Id.* The fact remains, however, that after *Perodeau*, only conduct occurring in the process of termination can be a basis for recovery for negligent infliction of emotional distress in the employment context, and on the evidence in this record, reasonable jurors could only conclude that Brunson no longer works at Bayer because she declined Bayer's offer of continued employment and thus there was no actionable conduct by Bayer and no basis for holding Bayer lia-

---

**19.** *Perodeau* discusses the policy implications of "employees [fearing] lawsuits by fellow employees," reasoning that the risk averse employees "may be less competitive with each other, may promote the interests of their employer less vigorously, may refrain from re-

porting the improper or even illegal conduct of fellow employees, may be less frank in performance evaluations, and may make employment decisions ... on the basis of fear of suit rather than business needs and desires." *Id.* at 758, 792 A.2d 752.

ble for negligent infliction of emotional distress in any discharge process.

### F. Negligent Supervision

Bayer asserts that Brunson's claim of negligent supervision is barred by Title VII as a matter of law and that there is no evidence that Bayer failed to supervise White. However, the cases on which Bayer relies for the proposition that Title VII preempts a negligent supervision claim do not stand for that generalized proposition, and there is sufficient evidence from which a jury could conclude that Bayer was negligent in disregarding past complaints about White.

Bayer relies on *Brock v. United States,* 64 F.3d 1421 (9th Cir.1995) and *Nolan v. Cleland,* 686 F.2d 806, 814 (9th Cir.1982). The plaintiffs in both cases were federal employees, and in each case the Ninth Circuit relied on the holding in *Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 829, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), that Title VII is the " 'exclusive, pre-emptive administrative and judicial scheme [available] for the redress of federal employment discrimination.' " In short, *Nolan, Brock* and *Brown* clearly refer only to claims of employment discrimination against the federal government, not to claims against any other kind of employer (such as Bayer) for violation of federal law: "In the case at bar ... § 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in *federal employment.*"

*Brown,* 425 U.S. at 835, 96 S.Ct. 1961 (emphasis added).[20]

The language of Title VII makes clear that preemption of overlapping state law remedies was not intended, *see* 42 U.S.C. § 2000e–7:

"Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."

Other courts have held under Connecticut law that a claim for negligent supervision can be stated in this context. *See Abate v. Circuit–Wise, Inc.,* 130 F.Supp.2d 341, 344–345 (D.Conn.2001); *Williams v. Trefz Corp.,* No. CV990335231S, 2001 WL 1077878 (Conn.Super. Aug. 20, 2001).[21] While Bayer contends that there is insufficient evidence from which a jury could conclude that White was unsupervised, the evidence of White's other reported misconduct towards female employees could establish that Bayer knew or should have known that White engaged in tortious conduct with similarities to that allegedly suffered by Brunson. *Cf., e.g., Abate,* 130 F.Supp.2d at 344 ("A defendant does not owe a duty of care to protect a plaintiff from another employee's tortious acts un-

---

**20.** *Brown* was apparently referring only to the types of discrimination covered by Title VII, inasmuch as other federal non-discrimination statutes have their own sections applicable to federal employment. *See, e.g.,* 29 U.S.C. § 633a (separate section of Age Discrimination in Employment Act applicable to federal employment).

**21.** At oral argument, Bayer argued that *Dobrich v. Gen. Dynamics Corp.,* 40 F.Supp.2d 90

(D.Conn.1999), demonstrates that a negligent supervision claim cannot be stated in this context. The conclusion in *Dobrich* appears to be case specific, as the court concluded only that it had "found no state-law authority for allowing plaintiff to proceed on this [negligent supervision] theory *under circumstances such as this ...." Id.* at 105 (emphasis added). In contrast, *Abate* and *Williams,* decided after *Dobrich* concluded that a negligent supervision claim can be stated in this context.

less the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct.") (citations omitted).

## IV. Conclusion

For the reasons set out above, Defendant's Motion for Summary Judgment [doc. # 47] is GRANTED in part and DENIED in part. Summary judgment is granted as to all claims other than Brunson's Title VII sex discrimination and state law negligent supervision claims.

IT IS SO ORDERED.