**Andrea ANTONOPOULOS, Plaintiff**

v.

**Dr. Johna ZITNAY and Dr. Jeffrey Hoos, Defendants**

**No. 3:03 CV 1362(CFD).**

United States District Court, D. Connecticut.

Feb. 28, 2005.

---

[redacted]

W. Martyn Philpot, Jr., Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for Plaintiff

Gregory B. Nokes, McCarter & English, Hartford, CT, for Defendants.

***RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT***

DRONEY, District Judge.

Plaintiff Andrea Antonopoulos brought this action against her former employers, Dr. Johna Zitnay and Dr. Jeffrey Hoos, alleging that her co-worker Kevin Kanjo sexually harassed her while both were employed as dental assistants to Zitnay and Hoos. Antonopoulos alleges that she was subject to hostile work environment sexual harassment and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"); she also alleges that defendants have committed the state law torts of intentional and negligent infliction of emotional distress and negligent supervision. Defendants have filed a motion for summary judgment on all counts.[1]

## I. Background [2]

Andrea Antonopoulos began working as a dental assistant in defendants' dental office in May 1998, approximately one month after dental assistant Kevin Kanjo had been hired. Antonopoulos and Kanjo initially were social friends who occasionally lunched together and exchanged cards on birthdays and other holidays. Antonopoulos also borrowed money from Kanjo to help buy a new car and to pay miscellaneous bills.

Antonopoulos says that she was uncomfortable with the language of some of Kanjo's cards and the fact that he sent her flowers, given that he was married. She claims that she told Kanjo that such behavior was improper and to stop sending her romantic notes and flowers. Nonethe-

1. Antonopoulos' complaint also refers to 42 U.S.C. § 1981. That statute "has been interpreted to forbid all racial discrimination in the making of private and public contracts." *Olmstead v. L.C. by Zimring,* 527 U.S. 581, 616 n. 1, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Antonopoulos, however, does not allege either that she is a member of a racial minority entitled to § 1981's protection or that any conduct by the defendants constituted racial discrimination or race-based harassment. All pleadings containing claims for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Since Antonopoulos validly has invoked the jurisdiction of the Court under Title VII and 28 U.S.C. §§ 1331, 1343(3), the subject matter jurisdiction for her complaint rests on those grounds. The Court hereby dismisses the plaintiff's § 1981 claim, but gives her 30 days from the date of this ruling to file an objection stating the basis for a claim under that statute.

2. The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated. Much of the background is taken from Antonopoulos' deposition and various statements (including a diary she kept of her contacts with Kanjo during the relevant time period). Although many of those assertions are disputed, the plaintiff's version of the events is recited here, as it should be for summary judgment consideration.

less, her complaint of sexual harassment specifically focuses on Kanjo's behavior beginning in March 2002.

On March 14, 2002, Antonopoulos states that she was changing her shoes in the office laundry room at the end of her shift when Kanjo came in, kneeled in front of her, and began kissing her. Antonopoulos pushed him away and started to walk out of the room when Kanjo grabbed her, kissed her again, and told her that he loved her. Antonopoulos told Kanjo that he was married and the two of them only could be friends; she then left the basement laundry room, punched out of her shift, and left work. Over the next few days, Antonopoulos claims that Kanjo continued to follow her around the office, again tried to kiss her, asked her to dinner (which invitation she declined), and left repeated messages on her home answering machine.

During the following week, although Kanjo was scheduled to be on vacation, he came to the office and continued to speak to Antonopoulos. On March 20, 2002, Antonopoulos was developing patient x-rays in the office darkroom when Kanjo entered, said that he wanted to talk to her, and blocked Antonopoulos' exit from the darkroom. This incident was observed by another employee, dental assistant Elaine Kennedy. Later the same day, Kanjo allegedly attempted to confront Antonopoulos in the office file room and grabbed her arm to prevent her exit.

The day after the darkroom and file room incidents took place was March 21, 2002. That evening, Kanjo drove to Antonopoulos' home after work, parked outside for several hours, and left repeated messages on her answering machine asking why Antonopoulos was ignoring him. The same night, Kanjo called Elaine Kennedy at home to ask what she and Antonopoulos recently had been discussing at work, and

whether Kennedy knew "if [Kanjo] had done anything wrong regarding Andrea." *See* Doc. # 31 at Exhibit E.

On Friday, March 22, 2002, Antonopoulos reported to office manager Susan Gregan that Kanjo had been harassing her so badly that her job had become intolerable. Antonopoulos signed a written statement, witnessed by Gregan, describing the incidents in the laundry room, darkroom, file room, and Kanjo's "stalking" of her apartment. Gregan then reported Antonopoulos' allegations to Dr. Zitnay, the dentist primarily responsible for personnel matters. Antonopoulos met with both Gregan and Zitnay during the afternoon of March 22. At that meeting, Gregan and Zitnay told Antonopoulos to file a police report regarding the stalking incident for her personal safety, and to call Gregan over the weekend. The two assured Antonopoulos that Zitnay would speak to Kanjo before his next shift began on Monday.

Zitnay and Gregan held a meeting with Kanjo on Monday, March 25, 2002. Kanjo denied all of Antonopoulos' allegations; nonetheless, Zitnay warned Kanjo that such behavior was unacceptable and that if Antonopoulos were proven true, Kanjo could be fired immediately. Kanjo was reminded to treat Antonopoulos in the same manner he did other employees. The meeting was written up as Kanjo's first warning and documented in his personnel file.

After meeting with Kanjo, Zitnay and Gregan again spoke with Antonopoulos, advising her to inform them of any new incidents and encouraging her to file a police report regarding the evening of March 21. Gregan also interviewed Elaine Kennedy, who gave a written statement corroborating Antonopoulos' account of being confronted by Kanjo in the office darkroom on March 20, and relating how Kanjo had called Kennedy at home on March 21

to discuss Antonopoulos' feelings toward him.

Antonopoulos concedes that Kanjo ceased to harass her with sexual conduct after his meeting with the office supervisors on March 25. She claims, however, that Kanjo then began to retaliate against her: he refused to acknowledge her presence in the office, spoke to her in a hostile manner, and complained to supervisors that Antonopoulos was leaving patient rooms dirty and failing to pull her weight in the office. Antonopoulos felt that Kanjo's retaliatory treatment, on top of the earlier harassment, made her life and her job "totally impossible ... to deal with." *See* Doc. # 26 at Exh. 4. Antonopoulos continued to inform Gregan when she felt that Kanjo was treating her differently from the other employees.

On April 2, 2002, Zitnay and Gregan again met with Kanjo, this time raising Antonopoulos' claims that he had been retaliating against her since March 25. Kanjo said that the allegations were false, but at this meeting "admitted to sitting in front of Andrea's house" and "that he had called her once or twice." Zitnay and Gregan told Kanjo "that he needed to be cordial to Andrea and treat her like any other dental assistant." *See* Doc. # 26 at Exh. 10. This meeting was written up as Kanjo's second warning and documented in his personnel file.

On April 3, 2002, both Antonopoulos and Kanjo reported to work. Upon seeing Kanjo, Antonopoulos felt chest pains and started to panic. Antonopoulos then called her doctor, who prescribed her anti-anxiety medication, referred her to a psychiatrist, and faxed a note to defendants' office placing Antonopoulos on immediate medical leave until April 8.

Gregan continued to phone Antonopoulos during the period that she was on medical leave, checking in on her emotional state. At one point, the two met outside of work, where Antonopoulos provided Gregan with a tape of the answering machine messages and copies of the notes that Kanjo had left for her; Dr. Zitnay had expressed interest in reviewing this material. On April 8, Antonopoulos' doctor faxed another note to defendants, extending Antonopoulos' medical leave for a second week. Gregan told Antonopoulos that the office would submit a workers' compensation claim for this time off so that Antonopoulos could be paid.

The parties dispute what happened after April 8, 2002. Antonopoulos claims that on April 9, Gregan called her and said that the defendants had agreed to terminate Kanjo. Antonopoulos told Gregan that, based on this news, she felt confident that her doctor would clear her to return to work on April 15. On Friday, April 12, Antonopoulos and Gregan spoke again by telephone. When Gregan asked Antonopoulos if she would be at work the following Monday, Antonopoulos responded that she would, as long as Kanjo was no longer employed. Antonopoulos claims that Gregan paused, then told her that Kanjo had not been fired, that Drs. Zitnay and Hoos had decided to retain him as an employee, that Antonopoulos and Kanjo simply would have to "iron things out," and that Antonopoulos needed to return to work immediately.

Antonopoulos claims that the actions of the defendants after April 8, 2002, and particularly their failure to terminate Kanjo, amounted to a constructive discharge of Antonopoulos. On the advice of her psychiatrist, Antonopoulos never returned to work at the defendants' office. Defendants, on the other hand, deny that they or Gregan ever represented to Antonopoulos that Kanjo would be fired. They assert that Antonopoulos, without explanation, failed to report to work after her medical

leave expired on April 15, 2002. On April 16, defendants wrote to Antonopoulos, informing her that her medical leave had expired and that they needed to speak with her treating physician about her medical status and work limitations. Antonopoulos twice refused to sign a Federal Express receipt for this letter (she claims that her attorney advised her not to accept any correspondence), and it ultimately was returned to defendants as undeliverable. *See* Doc. # 26 at Exh. 11. Apart from this litigation, the parties have had no further contact.

## II. Standard of Review

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then summary judgment is appropriate. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The Court resolves "all ambiguities and draw[s] all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

## III. Discussion

### A. Title VII Claims

#### 1. Hostile Work Environment

Title VII provides that "it shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The statute was intended "to strike at the entire spectrum of disparate treatment of men and women in employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Among the workplace behavior prohibited by Title VII is "sexual harassment that results in a 'hostile or abusive work environment.' " *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

In order to prevail on a claim of hostile work environment, a plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d

Cir.1997)).[3]

■ Defendants argue that Antonopoulos has failed to show facts sufficient to meet the hostile work environment standard. They further argue that even if Antonopoulos could prevail in establishing that Kanjo's harassment was sufficiently severe or pervasive to have created an abusive work environment, she has shown no basis for imputing liability for that behavior to defendants.

■ As to whether Antonopoulos' allegations qualify as severe or pervasive harassment, the Second Circuit has held that "whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment." *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir.1997). *Harris v. Forklift Systems* also provides a list of non-exclusive factors relevant in determining whether harassment qualifies as sufficiently severe or pervasive under Title VII: the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with the victim's work, and whether any psychological harm resulted. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. Antonopoulos' evidence reasonably could qualify as severe or pervasive under each of the *Harris* factors, and thus has met the tests for purposes of summary judgment analysis. Therefore, the Court finds that Antonopoulos has shown facts sufficient to withstand summary judgment on the first prong of the hostile work environment standard.

■ If the workplace harassment is proven actionably severe or pervasive, employers are presumed responsible (subject to certain defenses) for all sexual harassment perpetrated by a victim's supervisor. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). When the harasser is a non-supervisory colleague, however, an employer is held to a lesser negligence standard and "found liable ... only if [the employer] either 'provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Richardson v. New York State Dept. of Corr. Service,* 180 F.3d 426 (2d Cir.1999) (quoting *Murray v. New York Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir. 1995)); *see also Kracunas v. Iona Coll.,* 119 F.3d 80, 89 (2d Cir.1997) (holding that when a university professor sexually harasses a student over whom he or she lacks supervisory authority, the university only may be held liable "if it provided no reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action"). In the instant case, defendants argue that since Antonopoulos made a written complaint to them, Kanjo correspondingly was reprimanded, and all sexual harassment subsequently ceased, they were not negligent in their response to Antonopoulos.

---

**3.** Title VII also contains administrative exhaustion and statute of limitations requirements, in that claims brought in federal court first must have been timely filed with the Equal Employment Opportunity Commission and any appropriate state anti-discrimination agency. *See* 42 U.S.C. § 2000e–5(e)(1); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (explaining procedural requirements for filing suit under Title VII). The parties do not dispute that Antonopoulos timely exhausted her claims.

The Second Circuit has counseled that "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998). Viewing all facts in the light most favorable to the plaintiff, the Court finds that reasonable jurors could disagree as to whether the corrective measures taken by defendants were effectively remedial and non-negligent. Therefore, defendants' motion for summary judgment is denied as to plaintiff's Title VII hostile work environment claims.

### 2. Retaliation

■ Not only does Title VII prohibit sexual harassment that creates a hostile or abusive work environment, it also prevents employers from discriminating against employees who attempt to invoke their rights under the statute. *See* 42 U.S.C. § 2000e–3(a). To prove a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). There is no disagreement that Antonopoulos engaged in protected activity by reporting the alleged harassment. Defendants argue, however, that Antonopoulos' retaliation claim fails at the second stage, since she suffered no adverse employment action after making such a report.

A Title VII-qualifying disadvantageous employment action is "a materially adverse change in the terms and conditions of employment." *Sanders v. N.Y. City Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004). Examples of such materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). In the context of a Title VII retaliation claim, the Second Circuit also has "adopt[ed] the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case." *Richardson,* 180 F.3d at 446. An employer may be held liable for retaliatory co-worker harassment "if it knows about that harassment but fails to act to stop it." *Id.* at 446–47; *see also Knox v. Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996) (upholding as a correct statement of law a jury instruction noting "that employers can be liable [under Title VII] for co-worker [retaliatory] actions when they know about and fail to correct the offensive conduct").

■ Antonopoulos has made a prima facie case that Kanjo unfairly retaliated against her. Immediately after Kanjo was made aware of Antonopoulos' allegations on March 25, 2002, he allegedly proceeded to ignore Antonopoulos at work, speak rudely to her, and denigrate her work performance to supervisors. Antonopoulos complained to Gregan about this behavior on several occasions. On April 2, 2002, defendants warned Kanjo not to treat Antonopoulos differently from the other employees. Again, reasonable jurors could disagree as to whether defendants' response to the reported retaliation was sufficiently corrective or adequately emphatic to stop the offensive conduct. Therefore, defendants' motion for summary judgment is denied as to plaintiff's claim of Title VII retaliation.

## B. Emotional Distress Claims

### 1. Intentional Infliction of Emotional Distress

Antonopoulos claims that defendants ignored her complaints of sexual harassment and refused to curtail Kanjo's retaliatory behavior in a manner which intentionally caused her emotional and psychological distress, anxiety, and depression. Defendants argue that Antonopoulos' claim fails as a matter of law.

■ The elements of the tort of intentional infliction of emotional distress are well-established in Connecticut. In order for the plaintiff to prevail, she must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ. of Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (Conn.2000). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question of law." *Id.* Extreme and outrageous conduct has been defined as that which "goes beyond all possible bounds of decency, is regarded as atrocious, [and] is utterly intolerable in a civilized society...." *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 194 (D.Conn.2000).

■ While Antonopoulos has made a prima facie case that defendants' conduct may be actionable under Title VII, her allegations are insufficient to create a genuine issue of material fact as to whether the named defendants, Drs. Zitnay and Hoos, committed extreme and outrageous conduct. Although defendants' responses to Antonopoulos may have violated Title VII, they did not exceed all possible bounds of decency or tolerable social behavior. The Court therefore grants defendants' motion for summary judgment as to the claims of intentional infliction of emotional distress.

### 2. Negligent Infliction of Emotional Distress

Antonopoulos also claims that defendants should have known their treatment of her could reasonably have caused illness or bodily harm, and that their negligence caused her to suffer severe emotional distress, anxiety, and depression.

■ The Connecticut Supreme Court has held that "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." *Perodeau v. City of Hartford,* 259 Conn. 729, 750, 792 A.2d 752 (Conn.2002) (citing *Parsons v. United Tech. Corp.,* 243 Conn. 66, 88, 700 A.2d 655 (1997) (internal quotation marks omitted)). While Antonopoulos acknowledges that she was not formally terminated by defendants, she maintains that their insistence that she return to work alongside Kanjo constituted a constructive discharge, thereby exposing defendants to negligent infliction liability.

■ The United States Supreme Court recently concluded that hostile work environment sexual harassment could, in certain circumstances, constitute a constructive discharge. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). In order to establish constructive discharge, the plaintiff must not only show that she suffered severe or pervasive sexual harassment, but "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* at

2347. The employer may defeat a claim of constructive discharge "by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." *Id.*

The Court concludes that genuine issues of material fact exist as to whether Antonopoulos' workplace became so intolerable that she was forced to resign, as well as whether the defendants' policy for resolving complaints of sexual harassment were readily accessible and effective. Nevertheless, even if Antonopoulos were to prevail in establishing that she was constructively discharged when Gregan told her that Kanjo would not be fired and that Antonopoulos would have to return to work alongside him, she has failed to state a valid negligent infliction claim. Recovery for negligent infliction of emotional distress is limited to the termination process itself, not conduct preceding that discharge, be it constructive or actual. *See Armstead v. Stop & Shop Cos.*, 2003 WL 1343245, *6, 2003 U.S. Dist. LEXIS 4107, *4 (D.Conn. March 17, 2003) ("[A] claim of negligent infliction of emotional distress cannot be predicated on actions or omissions of employees occurring within the context of a continuing employment relationship.")

Although it is possible that a claim for negligent infliction of emotional distress could accompany a constructive discharge, Antonopoulos has not presented evidence of anything specific about Gregan's conduct during their phone conversation of April 12, 2002 (as opposed to the *content* of that conversation) which would have caused Antonopoulos emotional distress. Therefore, the Court grants defendants' motion for summary judgment on the claim of negligent infliction of emotional distress.

### C. Negligent Supervision

 The fourth count of Antonopoulos' complaint alleges that defendants' failure to properly remedy Kanjo's harassing behavior after March 22, 2002 constituted the state law tort of negligent supervision. To state a claim for negligent supervision under Connecticut law, "a plaintiff must plead and prove that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise. A defendant does not owe a duty of care to protect a plaintiff from another employee's tortious acts unless the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Abate v. Circuit–Wise, Inc.*, 130 F.Supp.2d 341, 344 (D.Conn.2001).

 Nonetheless, when a physically injured plaintiff also works for the defendant employer, any potential claim for negligent supervision is barred by Connecticut's workers' compensation scheme, which provides the exclusive remedy for on-the-job injuries. *See* Conn. Gen.Stat. § 31–284; *Ure v. Fineline Indus.*, 2004 WL 213171, *1–2, 2004 U.S. Dist. LEXIS 1381, *3–6 (D.Conn. Jan. 29, 2004); *Mingachos v. CBS, Inc.*, 491 A.2d 368, 196 Conn. 91, 98 (1985); *Jett v. Dunlap*, 425 A.2d 1263, 179 Conn. 215, 216 (1979). The only exception to the workers' compensation scheme is "intentional misconduct.... Anything short of 'genuine intentional injury' sustained by the employee and caused by the employer is [otherwise] compensable under the [Workers' Compensation] Act." *Perille v. Raybestos–Manhattan–Europe, Inc.*, 494 A.2d 555, 196 Conn. 529, 533–34 (1985). The Connecticut Supreme Court has expressly declined to extend tort liabil-

ity "to include accidental injuries caused by the gross, wanton, and wilful, deliberate, intentional, reckless, culpable, or malicious negligence ... of the employer." *Mingachos,* 196 Conn. at 107–08, 491 A.2d 368 (quoting 2A Larson, *Workmen's Compensation Law* § 68.13 (1976)); *see also Ure,* 2004 WL 1498140, *1–2, 2004 U.S. Dist. LEXIS at *5.

■ The *Jett–Mingachos–Perille* line of cases and the exclusivity of the workers' compensation remedy, however, appears limited to negligent supervision claims based on *physical* workplace injuries. The Connecticut Supreme Court clarified in its recent opinion in *Perodeau v. City of Hartford,* 792 A.2d 752, 259 Conn. 729 (2002), that a claim for negligent infliction of purely *emotional* distress is not barred by the exclusivity provisions of the Workers' Compensation Act, because the Act does not provide compensation for "mental or emotional impairment ... [not arising] from physical injury or occupational disease." *Id.* at 745–47, 792 A.2d 752 (quoting Conn. Gen.Stat. § 31–275(16)(B)(ii)).

■ Although the Workers' Compensation Act itself does not preclude an employee's claim for negligent infliction of emotional distress, the *Perodeau* Court nonetheless decided to limit negligent infliction claims to emotionally distressing conduct "occurring in the termination of employment." *Perodeau,* 259 Conn. at 763, 792 A.2d 752. The Court explained that it based that limitation on public policy concerns:

> We conclude that ... a pervasive chilling effect [on workplace behavior] out-

weighs the safety interest of employees in being protected from negligent infliction of emotional distress. In cases involving a termination of employment, on the other hand, the employee can no longer use the threat of a lawsuit to influence the conduct of his employer and fellow employees.

> Second, in light of the inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of emotional distress, extending the tort of negligent infliction of emotional distress to ongoing employment relationships would open the door to spurious claims.... We conclude that, although the rule that we adopt in this case may allow some legitimate emotional injuries to go uncompensated, the social costs of allowing such claims would outweigh the social benefits.

*Id.* at 758–59, 792 A.2d 752.

At least one Connecticut district court has denied a motion to dismiss a negligent supervision claim based upon the plaintiff's emotional distress resulting from workplace sexual harassment. *See Abate,* 130 F.Supp.2d at 344–46 (basing that decision on the fact that the workers' compensation statute did not bar claims of mental distress independent of physical injury). *Abate,* however, was decided before the Connecticut Supreme Court's decision in *Perodeau.*[4] *Perodeau* now seems to clarify that, regardless of the applicability of the Workers' Compensation Act, Connecticut bars all negligence-based emotional distress claims occurring within a continuing employment context.[5] As Antonopou-

---

**4.** In a post-*Perodeau* ruling, a second Connecticut district court judge denied to grant summary judgment on a negligent supervision claim. *See Brunson v. Bayer,* 237 F.Supp.2d 192 (D.Conn.2002). *Brunson* only evaluated whether Title VII preempted all overlapping state law claims, and concluded that the fed-

eral statute did not bar a negligent supervision claim as a matter of law. *Id.* at 209–10. *Brunson* did not consider whether such a claim might be barred under Connecticut law, based upon the reasoning of *Perodeau.*

**5.** Although *Perodeau* itself involved an employee suing another employee for negligent

los' claim is based on defendants' negligence in permitting Kanjo to engage in conduct which caused her mental distress and anguish, it would appear to be barred for the same public policy reasons which motivated *Perodeau.*

Therefore, the Court grants defendants' motion for summary judgment as to plaintiff's claim of negligent supervision.

## IV. Conclusion

Defendants' Motion for Summary Judgment [Doc. # 24] is GRANTED IN PART, as to plaintiff's claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision; and DENIED as to plaintiff's remaining claim, alleging hostile work environment sexual harassment and retaliation under Title VII.

infliction of emotional distress, its holding appears equally applicable to employees suing their employers, as is the case here.